NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| FERRARI NORTH AMERICA, INC., *Plaintiff*, v. ST. LOUIS MOTORSPORTS, LLC, and BENTLEY HOLDINGS, LLC, *Defendants*. | Civil Action No. 11-4487 (KSH) (PS) **OPINION** |

**Katharine S. Hayden, U.S.D.J.**

**I. Introduction**

Plaintiff Ferrari North America, Inc. ("FNA") has filed a complaint seeking a declaratory judgment. In substance, FNA demands a declaration that defendant St. Louis Motorsports ("Motorsports") is not an authorized dealer for new Ferrari vehicles and that FNA has not violated the federal RICO Act or the Automobile Dealers' Day in Court Act. FNA also seeks a declaration that it may terminate the existing service agreement at the end of the current month-to-month period. Motorsports and defendant Bentley Holdings, LLC ("Bentley") have filed a motion requesting: that the Court stay the litigation pending the outcome of parallel litigation in Missouri, that the Court dismiss for lack of subject matter jurisdiction, and that the Court dismiss for improper venue or, in the alternative, transfer the case to the Eastern District of Missouri.

**II. Facts and Procedural History**

The facts regarding the substance of the litigation are drawn from the complaint. Other facts involving the parties' negotiations in the run-up to the litigation, which are pertinent in

1

determining whether the Court has jurisdiction over the declaratory judgment, are drawn from certifications appended to the parties' briefs.

FNA is a Delaware corporation with its principal place of business in Englewood Cliffs, New Jersey; it serves as the "exclusive North American importer and distributor of new Ferrari vehicles and genuine Ferrari parts and accessories," and it is responsible for forming a "network of dealers authorized to sell new Ferrari vehicles and to provide authorized service." (Compl. ¶¶ 1, 6.) Maserati North America, Inc. ("Maserati"), a non-party, is similarly the exclusive North American importer and distributor of Maserati vehicles; during the pertinent time periods, FNA and Maserati "were separate but affiliated corporate entities" with some individuals serving as officers or employees of both. (*Id.* ¶¶ 7–8.)

Defendant Motorsports is a Delaware limited liability company with its principal place of business in Missouri. (*Id.* ¶ 2.) Defendant Bentley Holdings, LLC ("Bentley") is a Missouri limited liability company with its principal place of business in Missouri. (*Id.* ¶ 3.) In late 2001, Motorsports approached Maserati to inquire about becoming a Ferrari or Maserati dealer in St. Louis.[1] (*Id.* ¶ 10.) Motorsports was told that FNA had no interest in appointing a Ferrari dealer in St. Louis. (*Id.* ¶ 11.) Talks continued between Motorsports and Maserati, and on March 27, 2003, Maserati sent a letter of intent, in which it set forth the terms and conditions necessary for Motorsports to become an authorized Maserati dealer. (*Id.* ¶¶ 15–17.) On May 30, 2003, Motorsports and Maserati entered into a written Maserati Dealer Sales and Service Agreement. (*Id.* ¶ 19 & Ex. C.) Motorsports continued to acquire other luxury vehicle dealerships, and as of

---

[1] The recitation of the facts is abbreviated because the issues in this motion are restricted to jurisdiction and venue.

2

2010, it had written dealer agreements with not only Maserati, but also Lotus, Rolls Royce, Bentley, Lamborghini, Bugatti, and Aston Martin. (*Id.* ¶ 20.)

In 2004, Motorsports approached FNA regarding the possibility of being appointed a "service only" Ferrari dealer, meaning that it would be authorized to service Ferrari vehicles but not authorized to sell new Ferrari vehicles. (*Id.* ¶ 21.) The parties exchanged several letters, with some complications arising because of FNA's requirement that Motorsports comply with certain policies and because of negotiations about an option for Motorsports to become a full sales dealership. (*Id.* ¶¶ 22–24.) On February 16, 2005, FNA wrote to Motorsports to indicate its willingness, under certain conditions, to enter a two-year service-only agreement. (*Id.* ¶ 25.) On February 23, 2005, Motorsports responded that FNA had already committed to approving it as a service dealer and that because of its good performance record, it expected to be considered for new car sales. (*Id.* ¶ 28.) More letters were exchanged, and on May 26, 2005, the parties reached a written agreement by which Motorsports would become a Ferrari service point for a two-year period, after which the relationship would be subject to month-to-month renewal. (*Id.* ¶¶ 32–35.)

On December 1, 2010, representatives of FNA and Motorsports met in New Jersey. (*Id.* ¶ 38.) At the meeting, the representatives of Motorsports asserted that in 2003, FNA "had promised to appoint Motorsports as a Ferrari sales dealer if it was a good Maserati dealer." (*Id.* ¶¶ 39–40.) Over the following months, the dispute continued as to Motorsports' precise relationship with FNA. (*See id.* ¶¶ 41–44.) Lawyers became involved, culminating in assertions by Motorsports and Bentley that they intended to file several claims against FNA, including a federal civil RICO claim under 18 U.S.C. § 1962(c). (For ease of reference and where appropriate, the Court will refer to Motorsports and Bentley collectively as "Dealer.")

3

As revealed in the certifications attached to the parties' motions, on April 5, 2011, Dealer sent FNA a demand letter, alleging that Dealer would file suit if FNA did not remedy the situation. (Fuller Decl. ¶ 7, appended to Br. Supp. Mot. Dismiss ("Fuller Decl."); Goldberg Aff. ¶ 3, appended to Br. Opp. Mot. Dismiss ("Goldberg Aff.").) In response, FNA requested a copy of the complaint and suggested that settlement negotiations begin. (Fuller Decl. ¶ 8; Goldberg Aff. ¶ 3.) Dealer's counsel sent a draft complaint, and confidential negotiations ensued over the next few months. (Goldberg Aff. ¶ 4.) On July 31, 2011, Dealer's counsel sent an email to FNA's counsel indicating that unless two major issues could be resolved, she had instructions to sue FNA in Missouri on August 4, 2011. (Fuller Decl. ¶ 9; Goldberg Aff. ¶ 7.) FNA's counsel responded that his client's decisionmakers were not available to meet and that if Dealer did not send an e-mail by 6:00 p.m. stating that the lawsuit would not be brought, he would consider settlement discussions terminated. (Fuller Decl. ¶ 9; Goldberg Aff. ¶¶ 8–9.)

On August 2, 2011, once again Dealer communicated its intent to file on August 4, 2011. (Fuller Decl. ¶ 10; Goldberg Decl. ¶ 10.) Later that day, FNA filed the present complaint, seeking a declaratory judgment that its actions have been legal and that its interpretation of the current relationship with Dealer is accurate. [D.E. 1.] On August 3, 2011, Dealer filed a complaint in the United States District Court for the Eastern District of Missouri. (Fuller Decl. ¶ 14; Goldberg Aff. ¶ 13.) On August 30, 2011, Dealer filed the present motion to dismiss or, alternatively to transfer or to stay this action. [D.E. 15.]

### III. Discussion and Analysis

The complaint sets forth four counts that seek: (1) a "declaration that neither Motorsports nor [Bentley] is an authorized Ferrari sales dealer and that there is no obligation by FNA to appoint Motorsports (or [Bentley]) as an authorized sales dealer or to pay damages to either";

4

(2) a "declaration that FNA's conduct did not violate" the civil RICO statute, 18 U.S.C. § 1962(c); (3) a "declaration that FNA has no liability to Motorsports (or [Bentley])" under the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221 *et seq.*; and (4) a "declaration that Motorsports' service-only agreement may be terminated by FNA without liability upon notice effective at the end of the next succeeding month." (*See generally* Compl.)

In the present motion, Dealer makes two basic arguments. First, Dealer argues that FNA's federal claims do not constitute proper Article III cases and controversies, that they should therefore be dismissed for lack of subject matter jurisdiction, and that the remaining state law claims must also be dismissed because the Court cannot exercise supplemental jurisdiction in the absence of the federal claims. Second, Dealer presents several arguments why the Court should stay, dismiss, or transfer the case because of the parallel litigation in Missouri. For the reasons that follow, the Court finds that FNA has established subject matter jurisdiction and that the case should not be stayed or dismissed due to venue. The Court also finds, however, that for the convenience of the parties and witnesses, and in the interest of justice, the case should be transferred to the Eastern District of Missouri.

### A. Subject Matter Jurisdiction

Dealer asserts that the Court should dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. Specifically, Dealer asserts that federal question jurisdiction does not exist because FNA does not have an actual case or controversy under its two federal counts. (Br. Supp. Mot. Dismiss 7–8.) Absent federal question jurisdiction, supplemental jurisdiction cannot be exercised over the two state law counts. *See* 28 U.S.C. § 1367(a) (allowing supplemental jurisdiction only in a "civil action of which the district courts have original jurisdiction").

5

### 1. Article III and the Declaratory Judgment Act

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). The Supreme Court has held that the reference to a "case of actual controversy" refers to "cases and controversies in the constitutional sense," meaning "one of a justiciable nature." *Wyatt, Virgin Islands, Inc. v. Gov't of Virgin Islands*, 385 F.3d 801, 805–06 (3d Cir. 2004) (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937); *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 325 (1936)). In essence, the Declaratory Judgment Act is constitutional "so far as it authorizes relief which is consonant with the exercise of the judicial function in the determination of controversies to which under the Constitution the judicial power extends." *Id.* at 806 (quoting *Aetna*, 300 U.S. at 240).

To qualify as an Article III "case or controversy," the matter must be

> one that is appropriate for judicial determination. A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

*Id.* (quoting *Aetna*, 300 U.S. at 240–41). Related is the inquiry into whether a matter is ripe for adjudication, meaning that it "has matured to a point to require judicial adjudication" based on "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration"; "[a] dispute is not ripe for

judicial determination if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.* (citations and quotation marks omitted).

The parties disagree regarding the appropriate standard for determining the existence of a case or controversy in the context of a declaratory judgment action. FNA argues that a case or controversy has been established in a declaratory judgment action if FNA has a "reasonable apprehension" that it may face liability. (Br. Opp. Mot. Dismiss 16 (citing *Amresco Comm'l Fin., LLC v. T.P. Sampson*, No. 05-41, 2005 WL 1863282, at *8 (D. Idaho Aug. 4, 2005) (citations omitted)).) Dealer initially shared this understanding. (Br. Supp. Mot Dismiss 10 ("Although a reasonable apprehension of suit can be sufficient grounds to constitute a controversy within the meaning of the DJA, these grounds are not present in this Complaint.").) In its reply brief, however, Dealer argues that the Supreme Court rejected this standard in *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) (Reply Br. Supp. Mot. Dismiss 2–3) and that the applicable standard is

> that the dispute be definite and concrete, touching the legal relations of parties having adverse legal interests; and that it be real and substantial and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.
>
> *Int'l Dev. Corp. v. Richmond*, No. 09-2495, 2009 WL 3818141, at *3 (D.N.J. Nov. 13, 2009) (Brown, J.) (quoting *MedImmune*, 549 U.S. at 127).

Although both *MedImmune* and *Richmond* were patent cases, the Court does not find that distinction relevant, as the focal point of the analysis in those cases was the existence of a case or controversy under the Declaratory Judgment Act, and not a substantive question of patent law. To that end, however, the Court considers it notable that Dealer cites to *Richmond*, which based much of its Declaratory Judgment Act analysis on the Federal Circuit's decision in *Prasco, LLC*

*v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1336 (Fed Cir. 2008). In *Prasco*, the Federal Circuit observed that the Supreme Court's analysis in *MedImmune* noted "that requiring a reasonable apprehension of suit conflicted with the Court's precedent" because requiring such apprehension set too high a standard for finding a case or controversy. *Prasco*, 537 F.3d at 1336. And it held that "[w]hile the Supreme Court rejected the reasonable apprehension of suit test as the sole test for jurisdiction, it did not completely do away with the relevance of a reasonable apprehension of suit," and that "following *MedImmune*, proving a reasonable apprehension of suit is one of multiple ways that a declaratory judgment plaintiff can satisfy the more general all-of-the-circumstances test to establish that an action presents a justiciable Article III controversy." *Id.*

The Federal Circuit's reading of *MedImmune* is persuasive. In *MedImmune*, the parties disputed whether respondents had a right to royalties under a licensing agreement. 549 U.S. at 128. But because petitioner, although claiming it did not owe royalties, nonetheless paid them, its payments made "what would otherwise be an imminent threat at least remote, if not nonexistent" because "[a]s long as those payments are made, there is no risk that respondents will seek to enjoin petitioner's sales." *Id.* Notwithstanding, the Court sided with petitioner, who had brought the original declaratory judgment action, holding that Article III did not require petitioner to break or terminate its agreement before filing. *Id.* at 136. Thus, *MedImmune* involved an instance in which the "reasonable apprehension" test set too high a standard because even though the dispute was fully defined and suitable for judicial determination, petitioner's own decision to continue making payments meant that it could not reasonably apprehend any imminent suit. Therefore, under the Supreme Court's reasoning, the reasonable apprehension test remains one, but not the only, means of establishing an active case or controversy for purposes of the Declaratory Judgment Act. Accordingly, the Court rejects Dealer's argument

and finds that the reasonable apprehension test remains viable for purposes of determining the core issue of whether a case or controversy exists. As will be discussed in more detail below, FNA has satisfied the reasonable apprehension test on both the RICO and Automobile Dealers' Day in Court Act claims.

### 2. Racketeer Influenced and Corrupt Organizations Act

Dealer argues that FNA's two federal counts, which are based on the civil RICO statute and the Automobile Dealers' Day in Court Act, do not present an active controversy and should be dismissed. (*See* Br. Supp. Mot. Dismiss 7–24.)

On the RICO count, Dealer argues that although it set forth a RICO count in the draft complaint sent to FNA during negotiations, "it is fairly common for parties to assert positions during pre-suit negotiations that they subsequently abandon when a lawsuit is filed," and that simply asserting a threat of a civil RICO suit does not create a cognizable dispute. (*Id.* at 12–15.) Paradoxically, then, Dealer is seeking to dismiss FNA's claim on the RICO count not because it believes FNA is wrong, but rather because Dealer agrees with FNA's position to such an extent that no underlying case or controversy exists at all.

For support, Dealer relies on *Hudson County News Co. v. Metro Associates, Inc.*, 141 F.R.D. 386 (D. Mass. 1992) (adopting Findings and Recommendation of Magistrate Judge). There, plaintiffs and defendants engaged in several months of negotiations that ended with a series of agreements, but a dispute arose over accounting, and in a letter, defendants took the position that they had a cause of action against the plaintiffs under RICO. *Hudson County News Co.*, 141 F.R.D. at 388. Plaintiffs filed a declaratory judgment action based in part on RICO. Thereafter, defendants changed counsel, announced that they no longer believed they had a RICO claim, and filed an action in state court on state law claims only. *Id.* Applying the

reasonable apprehension test, the court noted that although it is clear an actual controversy existed between the parties, "the possibility that the RICO seed in the controversy may not come to fruition implicates the ripeness doctrine." *Id.* at 390. The court decided that the RICO issue was not ripe for adjudication, because the mere "possibility of a RICO suit will not chill the plaintiffs' activities in the sense that a threatened patent infringement suit can chill the manufacture of a project." *Id.* at 391. Specifically, a declaratory judgment would assure them that they could not be sued for money damages but would not "enable [them] to change [their] conduct to avoid damages which have not yet accrued." *Id.* (citations omitted). The letter on which plaintiffs' counsel relied merely stated that defendants were considering a RICO suit, and thus did not create a substantial showing of reasonable apprehension. *Id.* at 391–92.

The Court considers the present case distinguishable. Here, FNA did not receive an assertion in a letter that Dealer was considering a civil RICO claim. Rather, in April 2011, Dealer sent a draft complaint that asserted civil RICO as its first count. (Goldberg Aff. ¶ 3.) Dealer again sent a draft complaint, described as "the current version," containing a RICO count on July 31, 2011, along with a statement that Dealer had "been continuing to work on" it, and that counsel intended to file it in four days if an agreement could not be reached. (*Id.* ¶ 4; Fuller Decl., Ex. A.) According to Dealer's counsel, Dealer abandoned the RICO claim because counsel did not consider it "viable," and made this determination before reviewing FNA's declaratory judgment complaint. (Fuller Decl. at 3 n.1.) Nevertheless, when FNA got the preview of the about-to-be-filed complaint, it could reasonably apprehend RICO litigation on the horizon. The dispute was "definite and concrete," in that it was "real and substantial" enough to permit relief "through a decree of conclusive character" because there were no further facts that

10

needed to develop to solidify the grounding for the allegation. *See Richmond*, 2009 WL 3818141, at *3 (quoting *MedImmune*, 549 U.S. 127).

This conclusion is bolstered through the application of the Third Circuit's test for ripeness in the context of declaratory judgment actions seeking pre-enforcement review of a statute. *See Khodara Envtl., Inc. v. Blakely*, 376 F.3d 187, 196 (3d Cir. 2004). That test looks to "(1) the adversity of the parties' interests, (2) the conclusiveness of the judgment, and (3) the utility of the judgment." *Id.* (quoting *Pic-A-State Pa. Inc. v. Reno*, 76 F.3d 1294, 1298 (3d Cir. 1996)). Here, the parties' interests are fully adverse, as demonstrated through the ongoing litigation on the other counts already pending; a declaratory judgment on the RICO claim would make clear the parties' rights and obligations based on their contractual interactions; and the judgment would put to rest any question as to the viability of a RICO claim against FNA. In short, even though Dealer decided not to include a civil RICO claim in its filed complaint, the circumstances of the case establish a justiciable case or controversy over the declaratory judgment on the RICO claim.

### 3. Automobile Dealers' Day in Court Act

Dealer also contends that FNA's count under the Automobile Dealers' Day in Court Act ("ADDCA"), 15 U.S.C. §§ 1221 *et seq.*, is not a genuine Article III controversy because Dealer never suggested that it could bring a claim under this statute in its Missouri complaint or in the negotiations preceding the complaint's filing. (Br. Supp. Mot. Dismiss 15–16.)

The ADDCA provides, in relevant part, that

> [a]n automobile dealer may bring suit against any automobile manufacturer . . . and shall recover the damages by him sustained and the cost of the suit by reason of the failure of said automobile manufacturer . . . to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in

11

> terminating, canceling, or not renewing the franchise with said dealer.
>
> 15 U.S.C. § 1222.

A cause of action under the ADDCA consists of four elements: "(1) the plaintiff must be an automobile dealer; (2) the defendant must be an 'automobile manufacturer' engaged in commerce; (3) there must be a manufacturer-dealer relationship embodied in a written franchise agreement; and (4) the plaintiff must have been injured by the defendant's failure to act in good faith." *Maschio v. Prestige Motors*, 37 F.3d 908, 910 (3d Cir. 1994).

The first three elements are established in the facts of the complaint discussed above. FNA further asserts in the complaint that Dealer "contend[s] that FNA has acted in bad faith and made actionable misrepresentations in connection with the issue of" Dealer's status as an authorized dealer. (Compl. ¶ 59.) Such facts, if true, would establish the fourth element of an ADDCA claim and make cognizable the overall claim. Although it was not pleaded in the draft complaint circulated to FNA and apparently was never discussed in the course of negotiations, the ADDCA claim is so closely tethered to the factual content of the other claims that FNA had reason to apprehend litigation being brought against it.

The general problem with Dealer's arguments about both federal counts is that they operate under the mistaken premise that Dealer's Missouri complaint limits the world of potential declaratory judgment claims. The existence of a case or controversy in a Declaratory Judgment Act action is not, however, dependent on what a plaintiff in a direct action eventually alleges; rather, it is dependent on the existence of facts showing that the controversy is not "hypothetical or abstract" and is instead "definite and concrete, touching the legal relations of parties having adverse legal interests," capable of "specific relief through a decree of conclusive

character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Wyatt*, 385 F.3d at 806 (quoting *Aetna*, 300 U.S. at 240–41). An examination of the underlying facts demonstrates the existence of a definite and concrete controversy with regard to both of these claims. The fact that Dealer has not asserted them in the Missouri complaint and now disclaims in its moving papers any desire to bring them does not change this.

Because FNA has pleaded an Article III case or controversy on its federal claims, federal question jurisdiction exists and the motion to dismiss is denied.[2]

### B. Improper or Inconvenient Venue

Dealer argues that venue is improper in New Jersey and that, even if it is not improper, the Court should transfer the present action to the United States District Court for the Eastern District of Missouri. The Court finds that New Jersey is a viable venue for this action and that dismissal is therefore inappropriate, but also finds that that given the existence of parallel litigation and the defensive nature of the claim before this Court, transfer of the case to Missouri is appropriate.

Under 28 U.S.C. § 1391(b), venue is proper in: (1) "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located"; (2) "a judicial district in which a substantial part of the events or omissions giving rise to the

---

[2] Because federal question jurisdiction exists, the Court need not address FNA's alternative argument that diversity jurisdiction exists under 28 U.S.C. § 1332. It should be noted, however, that although the parties dispute whether the amount-in-controversy requirement is satisfied, they miss a more fundamental problem: it appears that complete diversity is missing because the complaint identifies both FNA and Motorsports as entities incorporated in Delaware. (Compl. ¶¶ 1–2.). For purposes of diversity jurisdiction, a corporation is deemed a citizen of the State "by which it has been incorporated and the State . . . where it has its principal place of business." 28 U.S.C. § 1332(c)(1). To maintain diversity jurisdiction, all plaintiffs must be completely diverse in citizenship from all defendants. 15 *Moore's Federal Practice* § 102.12[1] (3d ed. 2011).

13

claim occurred"; or (3) if neither of the first two options is available, any judicial district in which any defendant is subject to personal jurisdiction. Here, the first option makes the Eastern District of Missouri a proper venue. That leaves the question of whether, under the second option, the District of New Jersey is where "a substantial part of the events or omissions giving rise to the claim occurred."

When determining "whether a substantial part of the events or omissions giving rise to a cause of action occurred in a specific jurisdiction" for venue purposes, "[t]he test . . . is not the defendant's contacts' with a particular district, but rather the location of those events or omissions giving rise to the claim." *Bockman v. First Am. Marketing Corp.*, ___ F. App'x ___, ___ (3d Cir. 2012) (slip op. at 7) (quoting *Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291, 294 (3d Cir. 1994)). The requirement that the part of the events or omissions giving rise to the claim be "substantial" is "intended to preserve the element of fairness so that a defendant is not haled into a remote district having no real relationship to the dispute." *Id.* (quoting *Cottman Transmission Sys., Inc.*, 36 F.3d at 294). To that end, "[e]vents or omissions that might only have some tangential connection with the dispute are not enough." *Cottman Transmission Sys., Inc.*, 36 F.3d at 294.

Here, it cannot be said that the events giving rise to the claim have only a tangential connection with New Jersey. According to the complaint, in 2002, Motorsports wrote to Maserati to inquire about becoming a dealer for FNA, a New Jersey-based company. (Compl. ¶ 10.) Much of the underlying basis for the agreement between FNA and Dealer came from Dealer's interactions with Maserati in New Jersey. (*See id.* ¶ 13.) On at least one occasion in 2010, representatives of both FNA and Motorsports met in New Jersey. (*Id.* ¶ 38.) Dealer's reliance on *Cottman Transmission Systems, Inc. v. Martino*, 36 F.3d 291 (3d Cir. 1994), is not

14

persuasive because there, the connections to the forum state were much more tenuous than appear in this case, which at its core, is about contract negotiations that took place in a back-and-forth between Missouri and New Jersey, causing a more tightly-tethered relationship. And so because a substantial part of the claim arose in New Jersey, Dealer's motion to dismiss due to improper venue under Rule 12(b)(3) must therefore be denied.

However, there still remains the more substantial issue of whether the Court should transfer the action to the Eastern District of Missouri "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). A transfer under section 1404(a) "requires that a court make a case specific determination that such a transfer is proper." *White v. ABCO Eng'g Corp.*, 199 F.3d 140, 143 (3d Cir. 1999) (citing *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22 (1988)). The provision exists so that "where a 'civil action' to vindicate a wrong — however brought in a court — presents issues and requires witnesses that make one District Court more convenient than another, the trial judge can, *after findings*, transfer the whole action to the more convenient court.'" *Id.* (quoting *Cont'l Grain Co. v. Barge FBL-585*, 364 U.S. 19 (1960)). Among the factors to be balanced are "the convenience of the witnesses and those public-interest factors of systemic integrity and fairness that, in addition to private concerns, come under the heading of 'the interest of justice.'" *Id.* (quoting *Cont'l Grain Co.*, 364 U.S. at 29). The Third Circuit has highlighted numerous interests, both private and public, that should be considered in the context of a motion to transfer under section 1404(a). *See Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879–80 (3d Cir. 1995). The six private interests are: plaintiff's forum preference; defendant's forum preference; "whether the claim arose elsewhere"; "the convenience of the parties as indicated by their relative physical and financial condition"; "the convenience of the witnesses . . . only to the extent that the witnesses may actually be

15

unavailable for trial in one of the fora"; and the location of books and records "to the extent that the files could not be produced in the alternative forum." *Id.* at 879 (citations omitted). The six public interests are: enforceability of judgment; "practical considerations that could make trial easy, expeditious, or inexpensive"; potential administrative difficulty "resulting from court congestion"; "the local interest in deciding local controversies at home"; public policies of the fora; and "the familiarity of the trial judge with the applicable state law in diversity cases." *Id.* at 879–80 (citations omitted).

    The Court first turns to the private interests. The plaintiff's forum preference and the defendant's forum preference would ordinarily cancel out, except that the Court considers it appropriate to give less weight to FNA's preference because the record suggests that FNA undertook a race to the courthouse. *Accord Joanna Foods, Inc. v. Coca-Cola Co.*, No. 10-4844, 2010 WL 4721521, at *3 (D.N.J. Nov. 15, 2010) (Pisano, J.). Knowing that Dealer intended to file the Missouri suit within a few days, FNA filed this action with no apparent purpose other than to protect its rights in a more convenient forum than Missouri. *See EEOC v. Univ. of Pa.*, 850 F.2d 969, 976 (3d Cir. 1988) (general preference for having forum of first-filed suit decide case is not ironclad and does not apply in instances of forum shopping or "when the first-filing party initiated suit in one forum in anticipation of the opposing party's imminent suit in another, less favorable forum"). On the factor of whether the claim arose elsewhere, the action is an interpretive dispute over a contract negotiated across the two potential fora. The most relevant repercussions of how the contract is ultimately construed will fall on Dealer's Missouri dealership, but that does not mean that the action "arose" only in Missouri. On the factor of convenience for the parties, Dealer has submitted a declaration asserting that "[t]he impact of having the entire senior management team . . . being required to travel to New Jersey and attend

a trial, conferences, hearings and discovery that could last several weeks is incalculable," and that "[a]n extended absence due to attendance at trial in New Jersey jeopardizes the continued financial viability of the Dealership business." (Hill Decl. ¶¶ 5–6.) The risk of extensive travel and attendant inconvenience and expense is not unfounded, and the Court considers it significant in light of the fact that the present action is a purely defensive one. The remaining two private factors are neutral, as there is no indication that witnesses or documents could not be made available in either forum.

On public interests, problems of enforceability and congestion issues are not evident from the record; it is not possible to determine the existence of issues arising from unfamiliar law; and arguably both New Jersey and Missouri have an interest in ensuring the proper enforcement of their residents' contracts. The Court considers extremely significant, however, the factor concerning "practical considerations that could make trial easy, expeditious, or inexpensive." As an abstract matter, there is nothing wrong with parallel litigation. But in this case, Motorsports and Bentley are the only parties alleging that they have suffered harm. During the course of negotiations, they made it clear they were prepared to file a lawsuit, and sent a copy of a complaint to FNA along with the date they intended to file it. As a strategic response, FNA filed a purely declaratory complaint arising from the same facts as Dealer's Missouri complaint. (Indeed, the facts are so similar that FNA relies on little more than Dealer's assertion of a civil RICO count in its draft complaint as the basis for seeking a declaration that no such violation occurred.) Under these circumstances, it makes little sense for two courts to address substantially the same facts and law.

Accordingly, having weighed the factors, the Court finds transfer appropriate and grants the motion to transfer the case to the Eastern District of Missouri.[3] That would have been the venue for this case had FNA not filed its defensive complaint here, litigation is already underway there, and it represents a better use of both public and private resources for FNA's claims and Dealer's claims to be decided in the same place.

### IV. Conclusion

For the foregoing reasons, the motion to stay is denied, the motion to dismiss is denied, and the motion to transfer the action to the United States District Court for the Eastern District of Missouri is granted.

Dated: February 24, 2012

/s/ Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.

---

[3] The Court rejects Dealer's argument that the parallel litigation means a discretionary stay is appropriate. The Court "has broad power to stay proceedings," especially in the interests of judicial economy. *See Bechtel Corp. v. Local 215, Laborers' Int'l Union of N. Am., AFL-CIO*, 544 F.2d 1207, 1215 (3d Cir. 1976) (citation omitted). To that end, "a court may hold one lawsuit in abeyance to abide the outcome of another which may substantially affect it or be dispositive of the issues." *Id.* But this discretion is not boundless. "It is well settled that before a stay may be issued, the petitioner must demonstrate 'a clear case of hardship or inequity,' if there is 'even a fair possibility' that the stay would work damage on another party." *Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068, 1075–76 (3d Cir. 1983) (quoting *Landis*, 299 U.S. at 255). Dealer's request for a stay is really a request for the Court to wash its hands of FNA's claims until the Missouri court decides the issues, at which point *res judicata* would resolve many questions in the present action. The problem with this approach is that if it is taken to its logical conclusion, federal district courts would stay any declaratory judgment action in which the same issues were being disputed in another forum. The mere existence of parallel litigation does not justify a Court granting a stay, especially when the transfer mechanism provides a means for FNA's claims to be heard alongside Dealer's claims.